# United States Court of Federal Claims

No. 14-1165 L

Filed: August 28, 2018

_____

**JEANNETTE C. LIEBMAN,**
**Wife of/and PAUL E. RAMONI, JR.**

     *Plaintiffs,*

**v.**

**UNITED STATES OF AMERICA,**

     *Defendant.*

_____

Fifth Amendment Taking;
Inverse Condemnation; Laches;
Permanent and Exclusive
Occupation; Easement of Flow

    *Galen Scott Brown, Esquire,* Sullivan Stolier Knight, LC, New Orleans, L.A., for plaintiffs.

    *Peter Kryn Dykema, Esquire*, U.S. Department of Justice, Washington, D.C., for defendant.

## TRIAL OPINION

**HODGES,** *Senior Judge.*

    Plaintiffs Jeannette Liebman and Paul Ramoni, Jr. own a strip of navigable water along a canal in New Orleans known as the Michoud Fleet. Plaintiffs allege that the Government, acting through the National Aeronautics and Space Administration, caused a permanent physical taking of real property in the form of a servitude of drainage, also known as an easement of flow. This alleged taking results from NASA's construction and use of a redundant pump station that carries stormwater from defendant's property into the Michoud Canal. The pump station is located entirely on NASA's property which is known as the Michoud Assembly Facility.

    We conducted trial beginning July 9, 2018 in New Orleans, Louisiana. The central issue was whether NASA's redundant pump station created a taking by moving stormwater from its property, across a levee, and onto an abutting strip of the canal owned by plaintiffs.

Testimony and other evidence presented at trial established that the United States did take from plaintiffs a flowage easement across parts of their property.

## BACKGROUND

Plaintiffs' property is 5000 feet long and 150 feet wide with no access to land. It lies parallel to and shares a property line with NASA's to the west. NASA's property extends over a levee and for some distance beyond. The Michoud Fleet, as plaintiffs' property is known, begins at approximately twenty-six feet from the shoreline.

The best and only reasonable use of the Michoud Fleet is and always has been "barge fleeting." Barge fleeting is a process whereby barges are anchored or tied up to structures driven into the bottom of the canal. The barges might be in transit, waiting for an opportunity to move through the locks, or loading and unloading goods.

Plaintiffs' long, narrow strip of property is on the western side of the Michoud Canal. The canal is considered to be navigable, but plaintiffs have fee simple title to the bottom of the canal along the strip and to the water above it to the surface.

Plaintiffs purchased the Michoud Fleet in 1986, pursuant to a larger transaction, for consideration of $400,000. The previous owners conveyed the property to plaintiffs subject to a long-term lease paying them approximately $105,000 per year.[1] That lease was renewed pursuant to an option and it eventually terminated by its terms in December of 2004.

Eight months later, in August 2005, Hurricane Katrina devastated the New Orleans area causing crippling harm to its Maritime industry.

## FACTS

### 1. NASA's Assembly Facility and the Pump Stations

NASA's assembly facility and its redundant pump station are located off of the Gulf Intercostal Waterway near the Mississippi River. This is an area often flooded by rains and occasionally hurricanes. NASA has taken a number of steps to avoid disastrous flood levels near its facility, including building a storm water pump station ("original pump station") in the 1960's to draw accumulated rainwater from the area surrounding its buildings and move it across a levee into the canal. This system has been operational since construction, and it continues to be the primary means of protecting NASA from periodic floods. The original pump station is located at the corner of the canal where the canal meets the Gulf

---

[1] Annual payments began at $105,000 and thereafter increased each year according to the Producer Price Index pursuant to the terms of the lease.

Intercostal Waterway. The outflow pipes from the original pump station dispel the outflow water underneath the surface of the canal.

The Government wanted to avoid the risk of a single point of failure in case of extreme weather, and so it conducted a study to determine the best location for a redundant pump station. NASA filed a permit application for work within the Louisiana Coastal Zone with the United States Army Corps of Engineers in 2009. JX 8. That application included a list of adjacent property owners, which the Corps uses to notify neighboring owners of NASA's plans. JX 8 at 92. NASA's permit application did not include plaintiffs' names and address.

Construction of the redundant pump station began in June 2011 and lasted only a few months. NASA built the redundant pump station further north on the canal, about halfway up the length of the property line shared by the parties. The new, redundant facility has the same pumping capacity as the original, 1960's pump.

The redundant pump station has four pipes of roughly the same size as those on the original pump station. The pumps send accumulated water from heavy rains or floods over the levee through four large pipes similar to those used at the older facility. The primary difference for the purposes of this case is the design of the pipes; that is, the redundant pump station's outflow pipes drop water from several feet above the canal, while the pipes used by the original station release the water under the surface.

The outflow pipes stand approximately five feet above the water line about twenty-six feet from plaintiffs' property line. Water from the redundant pump station pouring into the canal causes turbulence to varying degrees as it hits the surface.[2] The entire structure abutting the canal, including the outflow pipes and two concrete flanks, covers sixty-five linear feet on the shoreline. The concrete flanks reach out into the water and end approximately fourteen to sixteen feet from plaintiffs' property line.

The structure also features an apron of concrete extending to a point only three-and-one-half feet from plaintiffs' property line. The purpose of the concrete apron is to divert any outflow from the bottom of the canal and the levee. The redundant pump station has official warning signs on the canal side reading:

---

[2] Testimony during trial was not consistent regarding the distance across the canal that surface disturbance continued. Moreover, evidence on the effect of surface disturbance on water down to the bottom of the canal was not available during trial.

> DANGER: DO NOT MOOR
>
> SUDDEN DISCHARGE WITHOUT WARNING.

The redundant pump station has been operational mostly for testing and maintenance since its construction in 2011.[3] Defendant provided evidence that the redundant pump station has run an average of .67 hours per month.

### 2. Plaintiffs' Knowledge of the Redundant Pump Station

Mr. Ramoni testified that plaintiffs were unaware of the studies by NASA that anticipated construction and of the actual construction of the redundant pump station until sometime after the structure was operational. When they did learn of it plaintiffs notified NASA of their concerns. NASA's counsel researched the matter and found that NASA had not known of plaintiffs' interest in property in the canal, but did find a copy of a 1963 easement agreement between NASA and plaintiffs' predecessors in interest. The easement was a servitude of drainage related to the original pump station built in the 1960's. JX 2.

Plaintiffs commissioned a report from an appraisal firm to establish proof of their property's value. Meanwhile, NASA engaged a title attorney, named Peter Title, who advised defendant that plaintiffs owned a fee simple in the Michoud Fleet. He suggested that NASA negotiate an agreement with plaintiffs to discharge the water onto their property for minimal compensation. JX 63.

### 3. Plaintiffs' Efforts to Lease Their Property

Plaintiffs bought the Michoud property in 1986 subject to a long-term lease that expired at the end of 2004. Since then, Mr. Ramoni has advertised the property for lease in two publications. However, plaintiffs have not leased the property for any purpose since termination of the original lease in 2004.

Mr. Ramoni testified that he received occasional calls indicating interest in the property between 2004 and 2012. During that time, AEP River Operations obtained a $10,000 option from plaintiffs to lease the Michoud Fleet. It applied for and eventually received a permit to moor barges on the property in 2012. However, AEP ultimately chose not to exercise the lease option and instead leased a smaller portion of property from another landowner on the opposite side of the canal. Plaintiff contends that the reason for AEP's change of mind was its discovery of the redundant pump station. No direct evidence or inferences led us to determine that this was necessarily the case. Since 2012 though, plaintiffs have received no inquiries about the property despite advertising it on a regular basis.

---

[3] We heard testimony suggesting that the pump station ran in 2014 to help lower the amount of standing stormwater at NASA, but it was not a consequential factor for trial.

### 4. Effects of the Redundant Pumping Station on Plaintiffs' Property

The trial focused on the effects of the redundant pumping station on plaintiffs' intended use of their property; i.e., leasing it for barge fleeting. Testimony from expert witnesses from both parties established that, when in operation, the water propelled onto plaintiffs' property by the redundant pumping station interferes significantly with plaintiffs' use of some portion of their property. Water leaving the pipes has a velocity of approximately thirty-five feet per second, or twenty-six miles per hour, and it hits the canal very close to or directly onto plaintiffs' property line. Videos of tests conducted by defendant's expert and entered into evidence during trial and expert testimony demonstrated an area of impact ranging from six-and-a-half feet to zero feet from the property line.[4]

Defendant emphasized that the redundant pump facility has not been used regularly for any lengthy period of time since it became operational in 2011; it is a "redundant" pump not only in name but also in function. However, NASA constructed the pump with the intent of using it if necessary, irrespective of possible protests from plaintiffs. Defendant's signs near the outflow pipes warning "DO NOT MOOR" and "DANGER" helped establish that the Government has removed all meaningful use of plaintiffs' property in the affected area. Testimony from credible and knowledgeable witnesses showed that the presence of the pipes and the possibility that the pumps could begin working at any moment, along with the dire warning on the signs, is enough to ensure that a reasonable person would not moor a barge in that area and for some distance away from the pipes. NASA has assumed the right to push water at a high velocity through plaintiffs' property at any time without warning or acquiescence.

---

[4] Plaintiffs' expert witness Kenneth Nelson testified that he completed calculations to determine the velocity of water exiting the pipes and the point at which the water impacts the canal. Tr. 151:8-22; 152:22-24. Mr. Nelson testified the water would hit the canal at approximately twenty feet, or six-and-a-half feet from the property line, but he also testified that such a calculation is conservative and would only apply to water coming from the bottom of the pipe, not water coming from the middle of the pipe or anywhere in between. Tr. 234:19-235:8. Based on this conservative estimate and visual evidence in the form of videos, JX 49 and JX 50, we find that the water from the outflow pipes hits the canal at points between the conservative estimate and the property line.

## DISCUSSION

### A. NASA's Projection of Water onto Plaintiffs' Property is a Physical Taking.

#### 1. Laches Does Not Bar the Claim.

We first address the defense of laches that was raised in the answer and reiterated at trial. Laches is an equitable defense and is generally a "flexible concept based on fairness and applied in the discretion of the court." *Todd v. U.S.*, 155 Ct. Cl. 87, 94 (1961) (quotations omitted) (citations omitted). To determine if laches applies to a claim, we consider "[t]he cause of the delay, the hardship to the defendant, the nature of the relief, and other factors." *Id.*

The equitable defense of laches is not an appropriate defense to this taking claim. Any delay by plaintiffs in bringing this action was caused by a series of actions and circumstances beyond their control, some of which were the defendant's doing. For example:

(1) NASA did not include plaintiffs in a list of adjacent landowners in their permit application to United States Army Corps of Engineers.

(2) NASA did not conduct reasonable due diligence through a records search to determine plaintiffs' ownership of the land.

(3) NASA did not locate -- or even search for -- a file in its system showing that the land directly in front of the outflow pipes was privately owned.

(4) Plaintiffs were not aware of construction on the redundant pump station during the four month period it occurred, even though it was an open construction. The plaintiffs' property is not easily accessible and has no land access.

(5) Plaintiffs had no reason to suspect that construction on NASA's property would necessarily interfere with the use and enjoyment of their own property.

(6) Plaintiffs notified NASA of their concerns within approximately one year after construction was completed and immediately upon finding out about the redundant pumping station.

Any delay in coming forward does not bar plaintiffs' claim of taking based on the equitable principle of laches.

#### 2. Takings Law

The United States has broad powers to take and use private property for its purposes so long as it pays just compensation to the landowner. Just as it cannot occupy personal property without just compensation, it cannot take an easement or other interest in land

owned by individuals without just compensation. *See e.g. Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1352 (Fed. Cir. 2003) (citing *United States v. Dickinson*, 331 U.S. 745, 748 (1947) ("Property is taken in the constitutional sense when inroads are made upon an owner's use of it to an extent that, as between private parties, a servitude has been acquired either by agreement or in course of time.")); *Nollan v. Cal. Coastal Comm'n,* 483 U.S. 825, 834 (1987).

Contrary to defendant's contentions at trial, plaintiffs do not need to show that they suffered a permanent and exclusive occupation destroying their right to possession. *Ridge Line*, 346 F.3d at 1352; *United States v. Causby*, 328 U.S. 256, 264 (1946) (holding that "it is obvious that if the landowner is to have full enjoyment of the land, he must have exclusive control of the immediate reaches of the enveloping atmosphere."). The Federal Circuit has recognized that "government actions may not impose upon a private landowner a flowage easement without just compensation." *Ridge Line*, 346 F.3d at 1353 (citing *Dickinson*, 331 U.S. at 750-51). "[I]f the government wants an easement . . . it must pay for it." *Ridge Line*, 346 F.3d at 1354 (citing *Nollan*, 483 U.S. at 842). "[For] purposes of takings analysis, a permanent physical occupation has occurred where individuals are given a permanent and continuous right to pass to and fro, so that the real property may continuously be traversed, even though no particular individual is permitted to station himself permanently upon the premises." *Ridge Line*, 346 F.3d at 1352 (citing *Nollan,* 483 U.S. at 831-32) (quotations omitted).

In *Ridge Line*, the plaintiff alleged that the construction of a postal facility caused storm water drainage to increase on its property, thereby creating an easement of flowage. The Federal Circuit provided an analytical framework to determine whether an inverse condemnation occurred: (1) whether takings law is the appropriate set of rules to apply, as opposed to tort law; and (2) whether a protectable property interest is in the property at issue. *Id.* at 1355.

The first element of the *Ridge Line* framework turns on whether the effects were predictable results of the Government's actions and "whether the government's actions were substantial enough to justify a takings remedy." *Id.* The effects are predictable where the invasion is the "direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action." *Id.* (citing *Columbia Basin Orchard v. United States*, 132 Ct. Cl. 445, 449 (1955).

The court also noted the importance of analyzing the "nature and magnitude" of the government action. *Id.* at 1356. To require compensation under takings law, the "invasion must appropriate a benefit to the government at the expense of the property owner, or at least preempt the owner's right to enjoy his property for an extended period of time, rather than merely inflict an injury that reduces its value." *Id.* By way of example, the *Ridge Line* opinion concludes that "isolated invasions, such as one or two floodings …, do not make

7

a taking …, but repeated invasions of the same type have often been held to result in an involuntary servitude." *Id.* at 1357 (quoting *Eyherabide v. United States*, 170 Ct. Cl. 498 (1965). Similarly, a compensable taking can also come about when "subjected to intermittent, but inevitably recurring, inundation due to authorized Government action." *Barnes v. United States*, 2010 Ct. Cl. 467 (1976).

The second element of the *Ridge Line* framework requires that plaintiffs possess a legally protectable interest. *Ridge Line,* 346 F.3d at 1357. In that case, the court used a principle of West Virginia property law to determine whether plaintiff's property rights were infringed. *Id.* This court considers state property law to determine the property interests in question.

### 3. Application to the Facts

We examine here the facts of this case in accordance with the framework set forth in *Ridge Line*. The Government took a flowage easement in that case by its construction of a Post Office facility above plaintiff's property. This case is somewhat analogous in that NASA built a redundant pump station next to plaintiffs' property and assumed the right to turn on the pumps at any time. Instead of creating erosion problems as in the West Virginia case, NASA's redundant facility next to plaintiffs' property has made parts of it unusable for barge fleeting. NASA asserted during trial that the pump station is meant only as a back-up to the original pump station, but it is also true that they can test the pumping station according to their own schedule or use it for any other purpose as needed. Even though NASA does not currently pump water onto plaintiffs' property at all times, it has assumed that right. NASA has taken a servitude of drainage or a common law flowage easement, from plaintiffs by its physical occupation.

The Federal Circuit's two-step test to determine whether this is an inverse condemnation case is the basis for our analysis. First, we consider if takings law, not tort law, is the appropriate legal framework to analyze this case considering the effects of and substantiality of the Government's actions. The effects on plaintiffs' property are predictable. We have no evidence to suggest that NASA intended to project fast-moving water onto plaintiffs' property and interfere with their property rights; NASA was unaware that a portion of the canal was privately owned prior to construction. However, it was predictable that by building outflow pipes that projected water landing at plaintiffs' property line would have that effect. It was a direct and natural consequence of building such a structure.

NASA's actions were substantial enough to justify a takings remedy. While defendant argued that the interference was minor because it affects only a small percentage of the total square footage owned by plaintiffs, the interference with some portion of the property is extreme. The propelled water creates significant turbulence in the canal on at

8

least some portion of plaintiffs' property and extends outward as it dissipates. This makes traversing or mooring on a larger portion of the property unsafe.

Defendant contended at trial that because the pumps are not expected to be in operation for long periods of time, the invasion is not substantial. However, because NASA reserves the right to turn on the pumps at any time for any length of time it deems necessary for whatever purpose, the invasion is substantial and permanent. Permanence is further evidenced by defendant's placement of signs warning just that: "DANGER: DO NOT MOOR. SUDDEN DISCHARGE WITHOUT WARNING." NASA has taken a right to invade plaintiffs' property at any time.

Second, plaintiffs possessed a legally protectable interest in their property. The civil law of property as it is practiced in Louisiana controls plaintiffs' right in their property. The case could not have reached trial in this court absent the fact that an individual can own rights to navigable waters in Louisiana. State law determines whether plaintiffs possess that interest.

The Louisiana Civil Code contemplates a natural "servitude of drainage" where waters naturally flow from the estate above to one below "provided the industry of man has not been used to create that servitude." LA. CIV. CODE ANN. Art. 655 (2017). The water propelled from NASA's facility onto plaintiffs' property is not naturally occurring and the "industry of man" has been used to direct the flow onto plaintiffs' property. The servitude of drainage here is not "natural" and therefore is a protectable property interest.

B. **The Property Right Taken Consists of a Servitude of Drainage Across 265 Feet by 150 Feet**.

Trial elicited extensive testimony and evidence regarding what portions of plaintiffs' property are affected by the redundant pump station. Certainly, NASA took that part of plaintiffs' property immediately in front of the pipes. Plaintiffs' and defendant's witnesses agreed that at least the property directly in front of the outflow pipes, an area of sixty-five feet by 150 feet, is no longer reasonably usable for barge mooring. Evidence of the redundant pump station's effect outside of that direct path, on the other hand, was mixed.

Defendant's expert witness on the matter was Captain Fitzgerald.[5] He testified that while he would not tie up any vessel directly in front of the pipes, he would have no concerns mooring vessels just outside the sixty-five foot corridor. Thus, defendant argued that the only affected area was a portion of the property approximately sixty-five feet by

---

[5] Captain Fitzgerald was qualified as an expert in navigation with limitation. While offered as an expert in this case, Captain Fitzgerald stated that he has never operated a commercial barge personally and does not possess the required license to do so.

150 feet, or less. Captain Fitzgerald supported this theory by conducting a test using "The Pelican," a thirty-five foot-long push boat belonging to NASA. He conducted a similar test for a site visit involving all participants prior to trial. The test was video-taped and entered into evidence at trial. JX 49; JX 50.

Plaintiffs' expert witnesses testified that more distance toward the middle of the canal was needed to ensure safety. Kenneth Nelson, an expert in civil engineering with particular expertise and experience in designing and building marine structures, testified that determining the velocity of the water after it hit the canal and dispersed would require extensive and complex mathematical calculations that he did not address. He stated however, that water hitting the canal from the pipes of the redundant facility has a velocity of thirty-nine feet per second. Tr. 157: 16-158:2; 171:8. Based on those calculations and observations from the videos of testing done by Captain Fitzgerald, Mr. Nelson concluded that "the radius of effect of the current flowing out from the impact point would be quite some distance … it's apparent at this high velocity impact, the water was affecting the body of water quite some distance out." Tr. 159:1-6.

Captain Wilson, plaintiffs' navigational expert, testified that turbulence in the canal reached out to 300 feet from the pipes, thereby covering the entire width of plaintiffs' property. Tr. 311:22-312:1. Video evidence confirmed this assertion. JX 49; JX 50. Captain Wilson concluded that barges should not be moored in front of the sixty-five foot structure, nor should they be moored within 200 feet on either side of the structure. Tr. 267:2-23.

The size of the easement appropriated by NASA in this case relies on determination of what portion of the plaintiffs' property is affected by servitude. That determination in turn depends on the extent to which water from the outflow pipes disperses. Fluid dynamics is a highly complex field of mathematics and understandably neither party found it necessary to invest in experts who could make the needed calculations. Therefore, no scientific or mathematical data was available to explain the complicated properties of liquid dispersing into liquid.

Testimony that we found credible showed that some area to the south and north of the redundant pump station pipes would not be safe to moor barges; turbulence was created by the pipes sending water into and over plaintiffs' property at a speed of approximately twenty-six miles per hour. That area was a buffer zone of varying length on either side of the pipes. Captain Fitzgerald expressed no concerns about mooring vessels anywhere other than the sixty-five feet in front of the structure.

Captain Wilson has had extensive experience piloting barges in various conditions. He was adamant that maneuvering and mooring a barge close to the outflow pipes would be unsafe due to the turbulence created in the immediate area. Captain Wilson suggested a

buffer zone of 200 feet on either side of the pipes. Captain Wilson was an impressive and credible witness, as was Captain Fitzgerald.

The area directly in front of redundant pumping facility, reaching across the entire 150 feet of plaintiffs' property at that point, has been subject to an involuntary servitude by NASA. We find that water pouring into the canal also creates turbulence for some distance to either side. The evidence at trial showed that the servitude affects plaintiffs' property rights equally 100 feet to the north and south of the drainage pipes. Consequently, the servitude of drainage imposed by NASA covers a total area of 265 feet by 150 feet.

### C. Just Compensation

The value of land taken by inverse condemnation is a factual issue. *Rasmuson v. United States,* 807 F.3d 1343, 1345 (Fed. Cir. 2015). This court has discretion to choose a means of finding the just compensation due property owners in such a case. *See McCann Holdings, Ltd. v. United States*, 111 Fed. Cl. 608, 613 (2013) ("The Court has discretion in adopting a methodology that awards a takings plaintiff just compensation.") (citing *Otay Mesa Prop., L.P. v. United States,* 670 F.3d 1358, 1369 (Fed. Cir. 2012); *see also Washington Metro. Area Transit Auth. v. United States*, 54 Fed. Cl. 20, 36 (2002)).

"A landowner subject to a taking is entitled to be put in as good a position pecuniarily as if his property had not been taken." *Rasmuson*, 807 F.3d at 1345 (quoting *Olson v. United States*, 292 U.S. 246, 255 (1934)) (quotations omitted). "The landowner must be made whole but is not entitled to more." *Id.* In the case of an easement, "the conventional method of valuation is the 'before-and-after' method, i.e., the difference between the value of the property before and after the Government's easement was imposed." *Rasmuson*, 807 F.3d at 1345 (quotations omitted) (citations omitted). However, "the focus of the damages analysis must always remain on awarding just compensation for what has been taken." *Otay*, 670 F.3d at 1369 (Fed. Cir. 2012).

#### 1. Value of Plaintiffs' Property Taken

The parties disagree on the proper method of calculating just compensation. Plaintiff contends that the more standard "before-and-after" method is the appropriate one to determine the compensation due in this case for the alleged taking of an area 465 feet by 150 feet directly in front of the pipes. Devaluation in value of the property claimed by plaintiffs is based on assertions of the loss of use of some portion of the property, the diminishing desirability of land separated into two pieces rather than one long piece, and the concerns with access to the northern portion of the property. Mr. Schwertz, plaintiffs' appraisal expert, testified that the value of the property before the alleged taking of 465

feet by 150 feet was $1,286,000, and the value after was $794,400.[6] JX 19 at 519. This leaves a difference of $492,000 in damages. *Id.* Mr. Schwertz used a discounted cash flow analysis with a capitalization rate of 8.5% to determine value after the alleged taking. JX 19 at 568.

Defendant promotes a more piecemeal analysis in determining the value of an area it believes should be no more than 200 feet by 150 feet in front of the pipes. This approach was based on its assertions that only a small area of plaintiffs' land is affected, the lack of change in highest and best use, and the lack of damage defendant's appraisal expert, Mr. Truax, perceived to the remaining property. Tr. 806:4-19. Defendant contends that the land taken, if any, is minor and so any compensation should be determined by the value of the land taken plus damages. Tr. 806:14-20.

Mr. Truax, defendant's appraisal expert, determined that the pumps did not inflict any damage to the remainder of plaintiffs' property. Tr. 806:25 – 807:20. He reached this conclusion after a site visit by analyzing the claimed damages of separation of the tract of land, access to the northern portion, and the effect of such attributes on the rental rate at similar properties. Mr. Truax determined that splitting the property into two pieces did not inherently diminish the value of the property as a whole. He further opined that access to the northern portion would not be impeded by the pipes nor would the pipes diminish the value to the northern portion of the property. Tr. 807:6 – 808:21.

The disparity in the ultimate appraisal amounts can be attributed to the weight placed on devaluation, if any, which occurred as a result of the taking and to some degree, the difference in area of the alleged taking. Plaintiffs' appraisal expert relied on plaintiffs' navigation expert in concluding that the value of the northern portion of the property decreased as a result of the pump station. In other words, the appraiser took for granted that a potential renter would be less likely to rent the northern portion because it may have concerns about crossing in front of the pipes to reach that portion.

While, as noted, we generally found Captain Wilson to be a credible and well-qualified witness, his assertion that barge operators would not find it safe to take a barge through the middle of the canal past the pipes to moor it north of the facility were unconvincing. The middle of the canal known as the "fairway," begins near the eastern edge of plaintiffs' property and extends for another 400 feet into the canal. The weight of the evidence, especially from the videos showing the reach of turbulence and the

---

[6] In his report, Mr. Schwertz concluded that the rental rate for the entire tract prior to the alleged taking was $19.25 per linear foot. After the alleged taking, he concluded the rate to be $18.75 for the northern tract and $19.25 for the southern tract. He then used a discounted cash flow analysis to determine the before and after market-value for the entire property. JX 19.

measurements that accompanied that video provided at trial, demonstrated that the turbulence did not continued to affect the canal so far into the middle that it would be unsafe to operate any vessel in the fairway. Therefore, the value of the northern portion of the property was not diminished by the taking.

Plaintiffs also contended that separating their property into two smaller tracts made it less desirable for potential renters. We did not find this assertion to be substantiated by the evidence at trial. Specifically, Mr. Truax testified that smaller tracts of this type of land were not less desirable for leasing and provided examples of similarly situated properties to back up that assertion. Therefore, the value of the individual tracts are not diminished by having been separated.

Other than the property directly affected by turbulence, the 265 by 150 feet area in front of the pipes, no damages have been inflicted upon the Michoud Fleet. Because no additional damages occurred, the value of the taking is the value of the land actually taken, whether determined by the "before and after" methodology or the piecemeal analysis used by defendants. The value of the easement is the market value of the 265 by 150 foot area describe above at the time of the taking. The experts agreed that an easement of flow or drainage in this case would have essentially the same market value as a fee simple in the same property and valued the property accordingly. Tr. 791:5-24; Tr. 368:15-23.

Plaintiffs' and defendant's expert appraisers calculated the value of the entire property prior to the taking as being around one million dollars.[7] They reached these valuations through the use of income capitalization, albeit with different approaches and different income rental rates.

Defendant's expert, Mr. Truax, used direct capitalization to reach his conclusions. This approach focuses on establishing the income and revenue stream likely to occur as of the date of valuation on a stabilized basis and determining the return parameters required for a buyer to invest in the property. Tr. 742:8-18. Those parameters are defined as the capitalization rate, or the needed return rate on the investment to make it viable. The market value is then determined by multiplying the amount of income expected per year by the percentage of return required by an investor/buyer.

---

[7] Defendant's expert, Mr. Truax, determined that the property was worth approximately $30 per linear foot in rent each year. JX 68. Therefore, given the entire 5000 feet of the property, the rent potential would be $150,000 per year. He then capitalized that at 10% meaning the value of the entire property would approach $1.5 million, given 100% occupancy, or $750,000 at 50% occupancy. Plaintiffs' expert, Mr. Schwertz, determined that the value prior to the taking was $1,286,000. Mr. Schwertz then determined the value after the taking to be $794,000, coming up with a devaluation of $492,000. JX 19. This devaluation was based on a taking of 465 feet by 150 feet of the property.

Plaintiffs' expert, Mr. Schwertz, used a cash-flow-type analysis. This analysis assumes a definite end period to an investment and so discounts the amount of return by the expected sale price at the end of the definite period. Tr. 745:3-18.

A direct capitalization approach is the more appropriate method to analyze the property. While we find that the easement covers a slightly larger area than that considered by Mr. Schwertz, we determined that his estimate of value of the 200 by 150 feet area was a conservative one. We have adopted his methodology and applied it to the slightly larger area. The range of value of the easement thus increases, but only marginally.

At a rate of $30 per linear foot for 265 feet, the annual rental revenue potential is $7,950. Given a capitalized rate of 10%, the maximum value is $79,500, assuming the property has a vacancy rate of 0%. Testimony at trial and historical data showing that the property had been vacant for years at the time of the taking make such a vacancy rate untenable. A vacancy rate of 50% drops the rental value per year to $3,975, capitalized at a rate of 10% results in a minimum value of $39,750.

The value of the easement taken from plaintiffs is $50,000 as of the date NASA began construction: June 6, 2011.

### 2. Interest

Plaintiffs are generally barred from collecting interest from the United States in this court. However, "just compensation" for property taken from private citizens required under the Constitution includes interest in an inverse condemnation case. *United States v. Sioux Nation of Indians*, 448 U.S. 371, 424 (1980) ("That taking implied an obligation on the part of the Government to make just compensation to the Sioux Nation, and that obligation, including an award of interest must now, at least, be paid."). Plaintiffs are entitled to "interest [] sufficient to insure that [they are] placed in as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation." *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 10 (1984) (citations omitted).

"Determining the proper rate of delay-based interest involves a factual inquiry largely left to the discretion of the court." *Liberty Ammunition, Inc. v. United States*, 119 Fed. Cl. 368, 402 (2014), *rev'd on other grounds,* 835 F.3d 1388 (Fed. Cir. 2016); *see also Dynamics Corp. of America v. United States*, 766 F.2d 518, 520 (Fed. Cir. 1985); *Datascope Corp. v. SMEC, Inc.,* 879 F.2d 820, 829 (Fed. Cir. 1989). Neither party provided an argument for the use of any particular interest rate, but this court has regularly employed the rate set forth in the Declaration of Takings Act, 40 U.S.C. § 3116 (2012), as the interest rate in takings claims. *See Waverley View Investors, LLC v. United States*, 136 Fed. Cl. 593 (2018); *Textainer Equip. Mgmt. Ltd. v. United States*, 99 Fed. Cl. 211, 223 (2011); *Vaizburd v. United States*, 67 Fed. Cl. 499, 504 (2005). Just compensation to plaintiffs

includes interest at the rate set forth in the Declaration of Takings Act from June 6, 2011 until the date of payment.

## CONCLUSION

This was an unusual and well-argued takings case that enabled the court to hear the evidence and testimony needed to enter a proper judgment. For the most part, witnesses were forthcoming and credible, their conflicts in testimony resulting from varying interpretations of facts that nevertheless were reasonable. The attorneys organized a pre-trial site visit that afforded the court an excellent "scene setting" that became more valuable as the trial went on.

The trial established that the United States took a portion of plaintiffs' property totaling an area of 265 feet by 150 feet directly in front of NASA's redundant pumping facility in New Orleans, Louisiana. According to Louisiana law, the property interest taken from plaintiffs is a servitude of drainage. The value of the property taken is $50,000 as of June 6, 2011. Plaintiffs are entitled to just compensation of $50,000 plus interest at the statutory rate.

The Clerk will enter judgment for plaintiffs in the amount of $50,000, plus interest calculated from June 6, 2011, to the date of payment in accordance with 40 U.S.C. § 3116.

**IT IS SO ORDERED.**

s/*Robert H. Hodges, Jr.*

Robert H. Hodges, Jr.
Senior Judge